763 So.2d 1223 (2000)
JIM MACON BUILDING CONTRACTORS, INC., etc., et al., Appellants,
v.
LAKE COUNTY, Florida, etc., et al., Appellees.
No. 5D99-2612.
District Court of Appeal of Florida, Fifth District.
June 2, 2000.
*1224 J.A. Jurgens and Scott M. Price of J.A. Jurgens, P.A., Longwood, and John H. Bill of Godbold, Downing, Sheahan & Bill, P.A., Winter Park, for Appellants.
John R. Hamilton of Foley & Lardner, Orlando, and Valerie C. Fuchs, Assistant County Attorney, Tavares, for Appellees.
SAWAYA, J.
The appellants, lot owners in Seminole Springs subdivision, appeal the dismissal of their breach of contract action against Lake County ("the county") and the United Southern Bank ("the bank"), appellees herein. We affirm in part and dismiss in part.
In their second amended complaint, the lot owners alleged that, as intended third-party beneficiaries of an irrevocable letter of credit issued by the bank to the county to secure funding for building certain infrastructure in the subdivision, they were entitled to damages as a result of the *1225 bank's refusal to honor the letter of credit and the county's failure to secure the funds pursuant to that document. Both defendants filed motions to dismiss for failure to state a cause of action pursuant to Florida Rule of Civil Procedure 1.140. The trial court granted the county's motion and dismissed the complaint without prejudice and with leave to amend. The court granted the bank's motion and dismissed the complaint with prejudice as against the bank.
The order granting the county's motion is not an appealable order and we dismiss the appeal of that order for lack of jurisdiction. See Klein v. Pinellas County, 685 So.2d 945 (Fla. 2d DCA 1996). However, the order granting the bank's motion is a final appealable order because it dismissed the complaint with prejudice and without leave to amend. See Salasky v. Humana Hosp. Kissimmee Auxiliary, Inc., 478 So.2d 428 (Fla. 5th DCA 1985). Therefore, we will confine the remainder of this opinion to addressing that order and to the facts distilled from the allegations made within the four corners of the complaint, including exhibits attached thereto.
Seminole Springs, Ltd. was the owner of certain real property that was platted and subdivided into Seminole Springs PUD Phase I. Seminole Springs, Ltd. agreed with the Board of County Commissioners of Lake County ("the Board") that in consideration for the Board approving the plat of the subdivision, it would build all required infrastructure in accordance with the construction plans approved by the county. It was further agreed that Seminole Springs, Ltd. would execute and deliver to the Board an irrevocable letter of credit in the sum of $222,200.00 which required Seminole Springs, Ltd. to build or cause to be built the infrastructure and if it failed to complete the infrastructure, the county would utilize the funds from the letter of credit to cause the required work to be completed. Pursuant to this agreement and in order to induce the Board to approve and accept the plat, Seminole Springs, Ltd. obtained an irrevocable letter of credit dated October 14, 1994 from the bank in the amount of $222,200.00 naming the Board as the beneficiary.
The work required to be performed by Seminole Springs, Ltd. in building the required infrastructure has not been completed. The county made demand upon Seminole Springs, Ltd. and the bank to complete the work, but Seminole Springs, Ltd. does not have the assets or the ability to do so and the bank refused to allow the county to draw on all of the funds pursuant to the letter of credit. The county and the bank subsequently entered into a settlement agreement which provided that the county could draw upon the letter of credit to finish construction of the roads in Phase I of the subdivision. The agreement further provided that upon the county's acceptance of the roads, another irrevocable letter of credit would be issued to the county as beneficiary for a central water system for the lots in Phase I of the subdivision. The settlement agreement was entered into on August 5, 1996, and the second irrevocable letter of credit was issued to the county on September 2, 1997. The second amended complaint alleged that the bank has wrongfully refused to allow the county to draw on the second letter of credit as well. The complaint further alleged that as intended third-party beneficiaries of both letters of credit, the Plaintiffs as lot owners were entitled to recover damages for the bank's breach of those documents.
The issue of first impression in Florida presented by this case is whether a party may claim damages for breach of contract as an intended third-party beneficiary against the issuer of a letter of credit. The purpose and the essential characteristics of a letter of credit dictate that we resolve this issue by holding that no such cause of action exists under Florida law.
The right of an intended third-party beneficiary to sue under a contract is *1226 recognized in Florida, but only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong. See Daniel v. Florida Residential Property & Cas. Joint Underwriting Ass'n, 718 So.2d 936 (Fla. 3d DCA 1998); Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd., 647 So.2d 1028 (Fla. 4th DCA 1994); Deanna Constr. Co. v. Sarasota Entertainment Corp., 563 So.2d 150 (Fla. 2d DCA 1990).
However, a letter of credit is not a typical contract. A letter of credit is generally defined as an undertaking by the issuer to the beneficiary at the request of or on account of the issuer's customer to "honor drafts or other demands for payment upon compliance with the conditions specified in the credit."[1] It primarily consists of "an offer by the issuer to purchase certain documents" and if those documents are not presented, the offer is not accepted and the issuer will not be obligated under the letter of credit. Fidelity Nat'l Bank v. Dade County, 371 So.2d 545, 548 (Fla. 3d DCA 1979). In essence, a letter of credit is simply a unique payment device used in commercial transactions for the primary purpose of allowing a buyer "to substitute its financial integrity with that of a stable credit source, usually a bank," so the risks inherent in selling goods or services on open account may be avoided. Banco Gen. Runinahui v. Citibank Int'l, 97 F.3d 480, 482 (11th Cir.1996) (applying Florida law).
Letters of credit are generally governed by Article 5 of the Uniform Commercial Code ("UCC").[2] The letters of credit at issue in this case, however, specifically provide that they are subject to the provisions of the 1983 revision of the Uniform Customs and Practice for Documentary Credits ("UCP").[3] The UCP is a "compilation of internationally accepted commercial practices" which may be incorporated by reference into an agreement between the parties.[4]Banco Gen. Runinahui, *1227 97 F.3d at 483. Although it is not accepted by courts or legislatures as the law in any jurisdiction, "the UCP applies to most letters of credit because issuers typically incorporate it into their credits."[5]Id. Therefore, the rules of custom and practice contained in the UCP are to be applied by courts unless they conflict with the provisions of the UCC. See Banco Do Brasil v. City Nat'l Bank, 609 So.2d 689 (Fla. 3d DCA 1992).[6] We will not have to analyze conflicting provisions in this case, however, because the provisions of the UCC and the UCP that pertain to the issue in these proceedings are consistent.
Under the provisions of the UCP and the UCC, there are three parties to a letter of credit: an issuer who agrees to pay conforming drafts presented under the letter of credit; a bank customer or account party who orders the letter of credit and dictates its terms; and a beneficiary to whom the letter of credit is issued who is entitled to collect monies under the letter of credit by presenting drafts and making proper demand on the issuer. See International Chamber of Commerce, Publication No. 400, Uniform Customs and Practice for Documentary Credits, art. 2 (1983) [hereinafter Uniform Customs and Practice][7]; see also §§ 675.103(1)(a), 675.109, Fla. Stat. (1993). Thus, a letter of credit forms the basis of three distinct and separate agreements between the parties: 1) the underlying contract or business arrangement between the customer and the beneficiary which gives rise to the necessity or desirability for the letter of credit; 2) the contract between the issuer bank and the customer whereby the bank agrees to issue the letter of credit; and 3) the letter of credit itself which is an agreement between the bank and the beneficiary. See Cargill, Inc. v. Sunlight Foods, Inc., 586 So.2d 366 (Fla. 3d DCA 1991); Braun v. Intercontinental Bank, 466 So.2d 1130 (Fla. 3d DCA 1985); see also §§ 675.103(1)(a), 675.109, Fla. Stat. (1993); Citizens & Peoples Nat'l Bank v. Futch, 650 So.2d 1008 (Fla. 1st DCA 1994); Uniform Customs and Practice, art. 2.
Although a letter of credit is often referred to as an agreement or contract, as between the issuer and the beneficiary it is more accurate to say that it is a document that creates certain duties between the parties. These duties are statutory, not contractual. This general concept is explained by White and Summers:
This undertaking in the letter of credit is sometimes called a contract, but most letter of credit specialists prefer to refer to it only as a letter of credit or as an *1228 "undertaking" and not as a contract. Among other things they wish to avoid contract inferences about third-party beneficiary status of others. In any event, the letter of credit is a unilateral undertaking with no promise by anyone other than the bank.
James J. White & Robert S. Summers, Uniform Commercial Code § 20-1(a), at 698 (5th ed.2000).
It is a fundamental rule embodied in the UCP and the UCC that "[t]he obligation of the issuer of a letter of credit is entirely independent and unrelated to the underlying transaction between the beneficiary" and the customer who requested issuance of the letter from the bank.[8]Fidelity Nat'l Bank v. Dade County, 371 So.2d 545, 548 (Fla. 3d DCA 1979); see also § 675.109(1)(a), Fla. Stat. (1993); Banco Gen. Runinahui; Sea Management Serv., Ltd. v. Club Sea, Inc., 512 So.2d 1025 (Fla. 3d DCA 1987); Braun; Uniform Customs and Practice, art. 3.[9] The independence rule, which primarily gives the letter of credit its commercial utility, was explained by the court in Fidelity National:
"In utilizing the rules of construction embodied in the letter or creditthe Uniform Customs and State statute one must constantly recall that the drawee bank is not to be embroiled in disputes between the buyer and the seller, the beneficiary of the credit. The drawee is involved only with documents, not with merchandise. Its involvement is altogether separate and apart from the transaction between the buyer and seller; its duties and liability are governed exclusively by the terms of the letter, not the terms of the parties' contract with each other."
371 So.2d at 548 (quoting Courtaulds North Am., Inc. v. North Carolina Nat'l Bank, 528 F.2d 802, 805 (4th Cir.1975)). As a corollary to the independence rule, section 675.109(1)(b), Florida Statutes (1993), also provides in pertinent part that an issuer is not responsible "for any act or omission of any person other than itself or its own branch."[10]
The independence rule and the other principles previously discussed are based on the practical considerations that the issuer lacks control over the underlying agreement and the selection of the beneficiary named in the letter of credit. Furthermore, in most cases, the issuer does not even know of the existence of the underlying agreement. This lack of control distinguishes the letter of credit from most other types of financial instruments used in commercial transactions and gives it independence from the law of contracts, negotiable instruments, guaranty, and most importantly to this case, from the law relating to intended third-party beneficiaries.
The appellants argue that the provisions of a county ordinance that require the developer to provide assurance that all required improvements shall be satisfactorily *1229 constructed in order to obtain county approval of any development plan are sufficient to establish a basis upon which the lot owners may sue the bank as intended third-party beneficiaries. We disagree. The letters of credit do not reference this county ordinance and in no way indicate that the letters are issued pursuant to the terms of this ordinance. Furthermore, each letter specifically states that it sets forth in full the terms of the undertaking by the bank and that it is subject to the provisions of the UCP which prohibit liability of the issuer for breach of the underlying agreement.
We conclude that any party injured by breach of the underlying agreement between the customer/buyer and the beneficiary must seek recourse against one of those parties, not the issuer of a letter of credit. To hold otherwise would vitiate the efficacy of the letter of credit in commercial transactions and frustrate its salutary purpose of enhancing efficiency and confidence in financial arrangements between buyer and seller.
DISMISSED in part; AFFIRMED in part.
ANTOON, C.J., and GRIFFIN, J., concur.
NOTES
[1] This definition is taken from section 675.103(1)(a), Florida Statutes (1993). A similar definition is contained in Article 2 of the 1983 revision of the Uniform Customs and Practice for Documentary Credits ("UCP"), which provides in pertinent part:

For the purposes of these articles, the expressions "documentary credit(s)" and "standby letter(s) of credit" used herein (hereinafter referred to as "credit(s)"), mean any arrangement, however named or described whereby a bank (the issuing bank), acting at the request and on the instructions of a customer (the applicant for the credit),
i. is to make a payment to or to the order of a third party (the beneficiary), or is to pay or accept bills of exchange (drafts) drawn by the beneficiary,
or
ii. authorizes another bank to effect such payment, or to pay, accept or negotiate such bills of exchange (drafts), against stipulated documents, provided that the terms and conditions of the credit are complied with.
International Chamber of Commerce, Publication No. 400, Uniform Customs and Practice for Documentary Credits, art. 2 (1983) [hereinafter Uniform Customs and Practice].
[2] As adopted in Florida, Article 5 of the UCC is codified in chapter 675, Florida Statutes.
[3] Uniform Customs and Practice, supra. The 1983 revision of the UCPwhich is applicable here under the terms of the letters of creditis generally referred to as "UCP 400." The UCP was revised again in 1993; the 1993 revision is referred to as "UCP 500." See generally International Chamber of Commerce, Publication No. 511, Documentary Credits: UCP 500 & 400 Compared (1993).

The letters of credit at issue here state in part:
This Credit is subject to the "Uniform Customs and Practice for Documentary Credits" (1983 revision), International Chamber of Commerce Publication No. 400 and to the provisions of Florida law. If a conflict between the Uniform Customs and Practice for Documentary Credits and Florida law should arise, Florida law shall prevail.
[4] The UCP and its purposes have been explained as follows:

The International Chamber of Commerce has adopted rules applicable to documentary letter of credit transactions. The Uniform Customs and Practice for Documentary Credits (UCP) rules are based on current practices and have been revised several times to incorporate new developments. The UCP rules are not law in any jurisdiction, but depend upon voluntary adherence by banks conducting documentary letter of credit transactions. Banks in 156 countries adhere to the UCP. Adherence to the UCP is signified by stating in the letter of credit that it is subject to the UCP.
6B William D. Hawkland & Tom L. Holland, Uniform Commercial Code Series § 5-102:7 (West Group 1999) (footnotes omitted).
[5] The reasons many letters of credit reference the UCP have been explained as follows:

The UCP is frequently invoked in letters of credit, whether they are international or not. There seems to be no question but that the UCP is one of these customs and practices that one can adopt by reference. In the United States it has become customary to issue letters of credit under the UCP even for transactions with no international aspects whatsoever. The rationale seems to be that since most letters of credit are for international trade and do operate under the UCP, bankers want all of their letters of credit to be under the UCP. The UCP and the UCC sometimes differ. Bankers want their staff to know one set of rules and want all transactions to operate under that regime.
William C. Hillman, Letters of Credit: Current Thinking in America 7 (1987).
[6] This rule is now codified in subsection 675.116(3), Florida Statutes (1999), which provides in pertinent part, "Except as otherwise provided in this subsection, the liability of an issuer, nominated person, or adviser is governed by any rules of custom or practice, such as the Uniform Customs and Practice for Documentary Credits, to which the letter of credit, confirmation, or other undertaking is expressly made subject."
[7] The provisions of this article are quoted in note 1, supra.
[8] The reason for this rule is explained in a comment to section 5-109(1)(a) of the UCC and to section 675.109(1)(a), Florida Statutes:

Paragraph (a) rests on the assumptions that the issuer has had no control over the making of the underlying contract or over the selection of the beneficiary, and that the issuer receives compensation for a payment service rather than for a guaranty of performance. The customer will normally have direct recourse against the beneficiary if performance fails, whereas the issuer will have such recourse only by assignment of or in a proper case subrogation to the rights of the customer.
U.C.C. § 5-109 cmt. 1 (1991);19B Fla. Stat. Ann. 388(1993). The provisions of section 675.109(1)(a), Florida Statutes (1993), are now found in section 675.108(6)(a), Florida Statutes (1999).
[9] This article specifically states, "Credits, by their nature, are separate transactions from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contract(s), even if any reference whatsoever to such contract(s) is included in the credit."
[10] This rule is now found in section 675.108(6)(b), Florida Statutes (1999).